IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TRI-COUNTY METROPOLITAN,  
TRANSIT DISTRICT, an Oregon Municipal  
Corporation,

    Plaintiff,

v.

TIME WARNER TELECOM OF OREGON,  
LLC, a Delaware Limited Liability  
Corporation, and SCHENCK  
COMMUNICATIONS, LP, an Alaska  
Limited Partnership,

    Defendants.

CV 07-691 PK

OPINION AND ORDER

PAPAK, Magistrate Judge:

  Plaintiff Tri-County Metropolitan Transit District (Tri-Met) filed this lawsuit arising out of damage to a Tri-Met subterranean duct used to house electrical systems for light rail vehicles. Defendant Time Warner Telecom of Oregon had a contract with Tri-Met that allowed Time Warner to directionally drill under Tri-Met rail lines. Time Warner subcontracted the project to

Page 1 - OPINION AND ORDER

defendant Schenck Communications and, on July 10, 2004, a Schenck employee drilled into Tri-Met's underground electricity duct. Tri-Met sued Time Warner for breach of contract. Tri-Met additionally sued both Time Warner and Schenck for strict liability (ultrahazardous activity) and negligence but has since withdrawn its negligence claim. Tri-Met also seeks punitive damages from Schenck.

The parties' cross motions for partial summary judgment are now before the court. Tri-Met seeks summary judgment on its breach of contract claim against Time Warner. Defendants Time Warner and Schenck seek summary judgment on the ultra-hazardous activity claim and Schenck seeks summary judgment on the punitive damages claim. This court has jurisdiction pursuant to 28 U.S.C. § 1332. For the reasons set forth below, Tri-Met's motion for partial summary judgment is granted. Time Warner and Schenck's motion for summary judgment on the ultrahazardous activity claim is granted. Schenck's motion for summary judgment on the punitive damages claim is denied as moot.

## BACKGROUND

### I. The License Application Process

Tri-Met is an Oregon municipal corporation authorized to provide public transit to Multnomah, Clackamas and Washington counties in Oregon. Tri-Met operates a light rail system powered by both underground and overhead electrical lines. Tri-Met sets ten feet or greater as a standard depth requirement for digging under the light rail tracks on the west side of Portland because Tri-Met knows that the area beyond ten feet deep is clear of its underground facilities, including power lines, operator break rooms, water lines and fiber optic cable.

Tri-Met provides an application process for companies that seek to lay cables under the light rail track lines. Tri-Met reviews the company's application and drawings and then drafts a

Page 2 - OPINION AND ORDER

license agreement. After both parties sign the license agreement, they must take additional steps before work on the project commences. Tri-Met sends a track access request form to the applicant. After the applicant returns the request, Tri-Met reviews it for conflicts and scheduling impacts, sets an appropriate date and time for the work, and then issues a track access permit to the applicant for that date and time.

Under Oregon law, an excavator must call the Oregon Utilities Notification Center before beginning to dig. Or. Rev. Stat. § 757.557; Or. Admin. R. 952-001-0050. The center provides notice to utilities companies, including Tri-Met, that they must mark the location of underground facilities at the excavation site or inform the excavator that no underground facilities exist. Or. Admin. R. 952-001-0070. Excavators must "[e]mploy hand tools or other such non-invasive methods to determine the exact location of the underground facility when excavation is to be made within the reasonable accuracy zone" of the marked underground utilities. Or. Admin. R. 952-001-0090.

## II.     Time Warner's License Application

Time Warner applied for a license to bore a fiber optic cable conduit under a light rail line on the west side of Portland. Time Warner submitted its own drawings of the project and Tri-Met used the information to complete the license application. On June 1, 2004, Tri-Met and Time Warner entered into a license agreement whereby Time Warner agreed to pay Tri-Met $1,500 in return for Tri-Met permitting Time Warner to "construct, maintain and operate" a conduit for fiber optic cable at a minimum depth of 10 feet below a portion of light rail tracks. The 10-foot minimum depth requirement appears on the first page of the license agreement and on the construction notes accompanying a schematic of the conduit location, attached to the agreement as "Exhibit A."

Page 3 - OPINION AND ORDER

In addition, the license agreement required that the conduit conform to the drawings that Time Warner submitted with its application. Specifically, it required that the drilling conform to "Sheet numbers 1, 2, 3, 7 and 8." Sheet number 7 includes warnings that power lines as well as water, sewer, gas and phone lines were in the area. The warning concerning power lines, however, did not indicate that the power lines were under the light rail tracks. The construction notes on Exhibit A and Sheets 7 and 8 also indicated, "All utility locations are approximate. Contractor is responsible for all utility locations," and required that the contractor call the Oregon Utility Notification Center for utility location.

Time Warner hired Schenck to drill and install the fiber optic cable underneath the light rail tracks. Schenck received a copy of the schematic that was attached as Exhibit A to the license agreement, along with Sheet 7, which included the warning about the presence of power lines in the area. Schenck's supervisors and area manager knew that the agreement required that Schenck drill at a minimum depth of ten feet.

A Schenck employee called the Oregon Utilities Notification Center and gave notice of the drilling project. The notification center, in turn, sent a request to Tri-Met to mark the presence of its underground utilities at the site. At the end of the day, the center also sent Tri-Met a summary of all utility location requests transmitted to Tri-Met that day, including the request for the Time Warner job.

Although the light rail line in the area of the proposed project has both overhead and underground power lines, Tri-Met did not mark the location of any underground power lines at the project site. Tri-Met denies that it received the request from the notification center. John Whipple, a Tri-Met employee, was responsible for responding to requests from the Oregon Utilities Notification Center, but may have been out of town at the time Schenck gave notice of

Page 4 - OPINION AND ORDER

their project. In Whipple's absence, another employee assumed responsibility for checking the tickets. That employee, however, would only check for tickets if Whipple was away from the office for two days or more. In addition, he did not check the tickets against the daily summary to confirm that Tri-Met received all the tickets listed in the summary.

### III.    The Utility Damage Incident

David Klinkenberg, a Schenck employee, conducted the directional drilling under the light rail tracks at the site. He calibrated his drilling machine's depth indicator with his hand-held locator before he started. He testified that he conducted the calibration away from visible high transmission power lines and metallic objects that could interfere with the reading. He also double-checked his calibration.

As Klinkenberg was drilling, the drill's electrical strike indicator sounded an alarm. When Klinkenberg checked the display, however, the voltage and amperage read zero. Klinkenberg assumed a false reading and continued drilling because he had experienced other false readings in the past due to static electricity generated by the machine itself. When the strike indicator alarm went off a second time, however, he stopped drilling. He later learned he had drilled into a Tri-Met electrical duct bank.

The facts in the record are inconsistent regarding the actual depth of the drill. Over the course of the litigation, Tri-Met has made various statements placing the depth from just over 8 feet below ground to just over 4 feet below. However, Tri-Met now asserts and defendants do not dispute that the bottom of duct bank lay only 5 feet below the ground. Moreover, both parties agree that Schenck drilled at a depth of less than 10 feet.

The drill damaged the duct bank, resulting in a loss of electrical power and an interruption in Tri-Met's light rail service. For two to three hours, Tri-Met had to provide

Page 5 - OPINION AND ORDER

alternate bus transportation to passengers stranded as a result of the damage. Tri-Met took six or seven hours to restore the system to full capacity.

Klinkenberg testified that the underground power lines may have caused an inaccurate depth reading by interfering with the communication between the machine's depth indicator and the hand-held locator.  Klinkenberg, however, also testified that the rail tracks, aerial power lines or rebar in reinforced concrete could have interfered with his depth reading.  He further indicated that, although 99 percent of the time the depth reading is accurate, short of digging a hole in the ground and measuring, he had no certain way of knowing his actual depth.

Klickenberg also testified that digging holes to confirm actual depth was not cost-effective, but that, had he known that there were underground power lines in the area, he would have taken additional precautions before drilling.  As noted above, state regulations require that excavators use non-invasive methods to determine the exact location of underground utilities when they drill near marked power lines.  Klinkenberg testified that, had he known of the presence of utilities, he would have contacted Tri-Met to ask if they had records that reflected what was underground or contacted his supervisors to request a new machine or to re-engineer the drill path.

**IV.     Danger Associated With Directional Drilling**

In 2005, the year after the accident, Schenck conducted nearly 250,000 feet of directional drilling in the Portland area.  During that period, 24 incidents of utility damage occurred.  The typical amount of property damage was less than $500.  Schenck has never experienced a directional drill accident that led to physical injury.  In addition, in 2005, Schenck experienced only two incidents where directional drill operators struck underground power.  The majority of utility damage incidents that year were the result of the failure of the utility company to mark the

Page 6 - OPINION AND ORDER

location of its utilities or their failure to mark accurately. Schenck avoids accidents by digging holes to visually verify the actual location and depth of marked underground power and gas utilities in the construction path.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the non-moving party. Fed. R. Civ. P. 56; *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Summary judgment, of course, may not be granted where the court finds unresolved issues of material fact, even in situations where the cross motions allege that no disputed facts exist. *Id.*

## DISCUSSION

**I.   Breach of Contract**

"To state a claim for breach of contract, plaintiff must allege the existence of a contract,

Page 7 - OPINION AND ORDER

its relevant terms, plaintiff's full performance and lack of breach and defendant's breach resulting in damage to plaintiff." *Slover v. Oregon State Bd. of Clinical Social Workers,* 144 Or. App. 565, 570, 927 P.2d 1098 (1996). Here, the parties do not dispute the existence of the contract or the meaning of its relevant terms. Both parties concur that the licensing agreement required that Time Warner drill at a minimum depth of 10 feet. In addition, the parties agree that Time Warner's sub-contractor drilled at a depth of less than 10 feet. The parties, however, dispute whether Tri-Met's failure to mark the site excuses Time Warner's non-performance.

### A.    Plaintiff's Performance

"It is well established, at least as a general rule, that a plaintiff who seeks to recover under the terms of an express contract for defendant's failure to perform its terms must plead and prove his own substantial performance." *Wasserburger v. Am. Scientific Chem., Inc.*, 267 Or. 77, 82, 514 P.2d 1097 (1973). Here, nothing indicates that Tri-Met failed to perform under the terms of the contract. Although Time Warner appears to suggest that its compliance with the minimum depth requirement was conditional on Tri-Met's marking of the underground utilities, the construction drawings attached as an exhibit to the license agreement provided that the contractor was responsible for all utility locations. Thus, I do not find that Tri-Met's failure to mark the utilities breached any duty owed to Time Warner under the license agreement.

### B.    Prevention

A party "who prevents another from performing a duty under the terms of a contract cannot avail himself of the other's failure to perform." *Gilbert v. California Oregon Power Co.*, 223 Or. 1, 15-16, 353 P.2d 870 (1960) (party's sawmill purchase prevented by other party's refusal to allow it to saw timber to create a fund to pay for a mill); *Winklebleck v. Portland*, 147 Or. 226, 242, 31 P.2d 637 (1934) (party's compliance with city ordinance prevented by city

Page 8 - OPINION AND ORDER

attorney's refusal to prepare papers required for full compliance); *Scott v. Hubbard*, 67 Or. 498, 506, 136 P. 653 (1913) (party led other party to believe that late performance would be accepted). A party, however, may not assert that the other party prevented his performance where the "required act was done but was done incorrectly." *Barton v. Maxwell*, 106 Or. App. 583, 588, 809 P.2d 1340 (1991) (homeowner did not prevent contractor from performing proper installation of HVAC system where homeowner paid for the work completed but fired contractor before the contractor was able to test the system and repair any deficiencies).

Here, Tri-Met's failure to mark the presence of utilities did not prevent Time Warner's compliance with the depth requirement. As the cases demonstrate, prevention typically applies in situations where a party precludes the other party's performance. Here, however, Time Warner merely presumed no utilities were present and did not conduct further inquiries when it saw Tri-Met had not marked utilities at the site. In addition, Klinkenberg admitted that he had ways to confirm that he was drilling below ten feet but chose not to use them and instead relied on the depth indicator when the visible light rail tracks, overhead power lines or reinforced concrete could have interfered with his depth reading. These facts demonstrate that Time Warner could have taken additional steps to confirm the location of utilities or that the drill was at its proper depth. Tri-Met did not stop Time Warner from taking those steps and thus did not prevent performance.

### C. Estoppel or Implied Waiver

A government agency may be estopped from asserting a claim inconsistent with a previous position that it has taken. *City of Mosier v. Hood River Sand, Gravel & Ready-Mix, Inc.*, 206 Or. App. 292, 319, 136 P.3d 1160 (2006) (citing *Dept. of Transp. v. Hewett Prof'l Group*, 321 Or. 118, 126, 895 P.2d 755 (1995)). "There must, however, have been reasonable

Page 9 - OPINION AND ORDER

reliance on the governmental actor's misstatements." *Id.* (citing *Kucera v. Bradbury*, 337 Or. 384, 407, 97 P.3d 1191 (2004)).  "Reliance on a misstatement is not reasonable if the governmental actor had no authority to make the misstatement." *Id.*  Moreover, "mere acquiescence does not give rise to estoppel where a governmental entity is involved." *State ex rel. Columbia County Sch. Dist. v. Columbia County*, 66 Or. App. 237, 246, 674 P.2d 608, (1983) (internal citations omitted).  Rather, the government entity must perform some affirmative act.  *Id.*

"Waiver, as distinguished from estoppel, is the intentional relinquishment of a known right." *Waterway Terminals Co. v. P. S. Lord Mech. Contractors*, 242 Or. 1, 26, 406 P.2d 556 (1965).  A party to a written contract may waive a provision of that contract by conduct or by oral representation.  *Bennett v. Farmers Ins. Co.*, 332 Or. 138, 156, 26 P.3d 785 (2001).  Waiver by conduct, however, requires a "clear, unequivocal, decisive act." *Id.* at 157.

Here, neither estoppel nor waiver excuses Time Warner's non-performance.  On the estoppel theory, Tri-Met's failure to mark the site did not constitute a misstatement, and, even if it did, Time Warner did not reasonably rely on it.  State regulations require that a utility mark the site or call the excavator to confirm that no utilities are present.  Time Warner did not present evidence to show that Tri-Met affirmatively represented no utilities were there.  At most, Time Warner relied on Tri-Met's failure to mark when the drawings and the depth requirement itself suggested that utilities could be present.  On the waiver theory, no evidence supports that Tri-Met intended to relinquish a right when it did not mark the site.   In fact, Tri-Met maintains that it never received the request to do so.   Thus, Tri-Met did not state that it would not enforce the minimum depth requirement.

### D. Plaintiff's Damages

In a contract case, the contract defines the rights and duties of the parties. *See Stumpf v. Continental Casualty Co.*, 102 Or. App. 302, 309, 794 P.2d 1228 (1990) (insurer was not entitled to assert comparative fault as a defense in an excess liability case because the insured's alleged comparative negligence was not relevant to the insurer's contractual liability). Thus, a plaintiff in a breach of contract action may recover consequential damages reasonably within the contemplation of the parties at the time they executed the contract "and which were the approximate and natural consequences of the breach by defendant." *Senior Estates, Inc. v. Bauman Homes, Inc.*, 272 Or. 577, 585, 539 P.2d 142 (1975) (internal citation omitted); Oregon Uniform Civil Jury Instruction No. 65.18 (2005) ("You can award money for those damages that arise naturally and necessarily from the breach of contract and would place the [plaintiff/defendant] in the same position as if the contract had not been breached.")

Here, Tri-Met has presented evidence of damages that resulted from Time Warner's breach of the minimum depth requirement. Time Warner does not rebut that evidence but instead suggests that it may be entitled to apportionment of damages based on Tri-Met's comparative fault. That issue is not before the court on Tri-Met's motion for partial summary judgment. Rather, Tri-Met seeks summary judgment on liability for breach of contract and rightly leaves the question of the amount of damages for the jury. Moreover, Oregon case law suggests that comparative fault does not reduce consequential damages arising from a breach of contract. See *Shin v. Sunriver Preparatory Sch., Inc.*, 199 Or. App. 352, 376, 111 P.3d 762 (2005) (references to "fault" in Oregon's comparative fault statute embrace "tortious conduct, however described, in which contributory negligence is an appropriate defense").

Tri-Met has met its burden to come forward with evidence of its compliance with the

Page 11 - OPINION AND ORDER

contract, Time Warner's breach, and that damages resulted. I therefore grant Tri-Met's motion for summary judgment on its breach of contract claim.

## II.     Ultra-Hazardous Activity

"Whether an activity is abnormally dangerous is a question for the court." *McLane v. Northwest Natural Gas Co.*, 255 Or. 324, 327, 467 P.2d 635 (1970). In Oregon, an activity is abnormally dangerous only where it is "extraordinary, exceptional, or unusual, considering the locality in which it is carried on; when there is a risk of grave harm from such abnormality; and when the risk cannot be eliminated by the exercise of reasonable care." *Buggsi, Inc. v. Chevron USA, Inc.*, 857 F. Supp. 1427, 1432 (D. Or. 1994), (quoting *McLane*, 255 Or. at 328-29). If an activity does not pose a risk that is potentially lethal or highly destructive of health or property, it may nonetheless be abnormally dangerous if mishaps are "highly probable" or the activity "can be carried on only with a substantially uncontrollable likelihood that the damage will sometimes occur." *Koos v. Roth*, 293 Or. 670, 678, 652 P.2d 1255 (1982). Moreover, a danger that is only ordinary in an appropriate location may be abnormal if it takes place "where it exposes others to an extraordinary risk or magnitude of harm." *Id.* at 682. An activity is not abnormally dangerous, however, if it constitutes an "essential service activit[y] like the distribution of gas or electricity." *Id.*

Oregon courts also look to "stringent legislative or administrative safety regulations" as evidence of the abnormally dangerous nature of an activity. *Id.* The court, however, should inquire into the type and degree of danger that the regulation recognizes. *Id.*. at 678, 690 (statutory provisions imposing controls on open field burning reinforce conclusion that field burning is abnormally dangerous); *Buggsi*, 857 F. Supp. at 1432 (holding that operation of a gasoline and diesel storage facility constituted ultrahazardous activity where Oregon statute

Page 12 - OPINION AND ORDER

imposed strict liability for damages caused as a result of that activity). "If safety regulations and licensing or other permit requirements alone implied a finding of exceptional danger, strict liability would be the rule and negligence the exception." *Koos*, 293 Or. at 609.; *see also City of LaGrande v. Union Pac. R.R.*, No. 96-115-ST, 1997 U.S. Dist. LEXIS 23939, at *52 (D. Or. July 18, 1997) (construing Oregon law to conclude that regulation does not render an activity "abnormally dangerous per se.").

Oregon courts faced with the question of whether an activity is abnormally dangerous primarily focus on "assessing abnormal hazards by their potential for harm of exceptional magnitude or probability despite the utmost care." *Burkett v. Freedom Arms, Inc.,* 299 Or. 551, 557-58, 704 P.2d 118 (1985). Thus, courts in this district have applied Oregon case law to find that an activity is not unreasonably dangerous where evidence demonstrates that reasonable precautions could prevent the harm. *City of Portland v. Boeing Co.*, 179 F. Supp. 2d 1190, 1205 (D. Or. 2001) (use of industrial solvent not abnormally dangerous where uncontroverted evidence showed reasonable precautions could prevent harm); *City of LaGrande*, 1997 U.S. Dist. LEXIS 23939 at *53 (operation of railroad diesel fueling facilities not abnormally dangerous where plaintiff's expert testified that common procedures and containment systems would have prevented spills). A court, however, must have sufficient evidence before it makes that determination. *See Ellis v. Ferrellgas. L.P*., 211 Or. App. 648, 655-56, 156 P.3d 136 (2007) (trial court erred in granting summary judgment where parties' experts disagreed on whether reasonable precautions could have prevented the harm and parties offered no evidence on whether the activity is common or appropriate to the place where it occurred).

Here, the fact that directional drilling is subject to regulations and permits does not prove that it is abnormally dangerous. The regulations at issue address excavation in general and

Page 13 - OPINION AND ORDER

neither single out directional drilling nor impose strict liability for accidents. Thus, while I recognize that the regulations may support a finding that directional drilling is abnormally dangerous, they do not, on their own, suffice.

Moreover, uncontradicted testimony suggests that highly destructive drilling accidents are rare. In 2005, accidents in Portland did not lead to any physical injury and typically resulted in $500 or less in property damage. In addition, defendants presented evidence that even minor accidents are infrequent. Although defendants do not provide data regarding the number of drilling projects that result in accidents, they do indicate that, in over 250,000 feet of drilling in Portland in 2005, only 24 incidents of damage occurred.

More importantly, the evidence suggests that reasonable precautions can prevent utility damage. In the normal course, as required by state regulations, utility companies mark the location of utilities and drill operators dig holes to visually confirm the location before drilling in those areas. Plaintiffs do not rebut this evidence.

Although I recognize that drilling under mass transit rail lines in an urban setting poses significant risks, I cannot conclude that the activity is abnormally dangerous on the record presented before me. That record contains undisputed evidence that directional drilling does not lead to significant accidents and that the risks it poses can be prevented with reasonable precautions. Accordingly, I grant defendants' motion for summary judgment on Tri-Met's claim for strict liability for ultra-hazardous activity.

My grant of summary judgment on ultra-hazardous activity eliminates Tri-Met's only claim against Schenck. As a result, I do not reach whether Schenck may be liable for punitive damages.

## CONCLUSION

Plaintiff Tri-Met's partial motion for summary judgment (#31) is granted. Defendants' motion for partial summary judgment on the strict liability claim (#24) is granted. Defendant Schenck's motion for partial summary judgment on the punitive damages claim (#24) is denied as moot.

Dated this 14th day of October, 2008.

    /s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge